# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4651-17T2
                   A-4692-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

K.M.R. and C.S.,

      Defendants-Appellants,

and

K.F.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.J.R.,
K.B.R., K.M.R.-S., and K.K.R.-S.,

      Minors.

_____

Submitted May 6, 2019 – Decided June 17, 2019

Before Judges Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0042-18.

Joseph E. Krakora, Public Defender, attorney for appellant K.M.R. (Gilbert G. Miller, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant C.S. (Steven Edward Miklosey, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Merav Lichtenstein, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Danielle Ruiz, Designated Counsel, on the brief).

PER CURIAM

In these consolidated appeals, defendants K.M.R.[1] (the mother) and C.S. (the father) appeal from the May 29, 2018 judgment of guardianship terminating their parental rights. The judgment terminated the mother's parental rights to her two sons, K.J.R. and K.B.R., and her two daughters, K.M.R.-S. and K.K.R.-

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

S., and terminated the father's parental rights to K.M.R.-S., the only child they had together.[2] Defendants were never married. When the judgment was entered, K.J.R. was eight years old, K.B.R. was six years old, K.M.R.-S. was three years old, and K.K.R.-S. was one year old.

The mother contends that the Division failed to prove all four prongs of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. She asserts that the trial court's contrary ruling "was not supported by substantial and credible evidence in the record and in any event was so wide of the mark that a mistake must have been made." The father challenges the Division's proofs for prongs three and four only. He asserts "the record does not support the legal conclusion that [the Division] . . . undertook reasonable efforts to provide [him] with . . . visitation[,]" and "[t]he trial court's decision to suspend [his] visitation indefinitely . . . release[d] [the Division] of its statutory obligation . . . without due consideration to any alternatives such as

---

[2]  Other than indicating that all her children had different fathers, the mother refused to disclose the identity of the biological fathers of K.J.R. and K.K.R.-S, and, despite extensive paternity testing, the Division of Child Protection and Permanency (Division) was unable to ascertain their identities. Although K.F., the biological father of K.B.R., was aware of the litigation, he did not participate in the guardianship proceedings in the trial court or on appeal. His parental rights were also terminated by the trial court upon the Division's submission of an affidavit documenting their unsuccessful efforts to locate or serve him. See N.J.S.A. 30:4C-17(c).

therapeutic visitation." He continues that "the trial court erred in holding that [the Division] sought alternatives to termination of parental rights" when two relatives he identified "were not fully assessed by the time of the guardianship trial." The Law Guardian supported termination before the trial court and, on appeal, joins the Division in urging us to reject defendants' arguments in their entirety and affirm. Having considered the parties' arguments in light of the record and applicable legal standards, we affirm.

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

4

(4) Termination of parental rights will not do more harm than good.

The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

On October 11, 2017, the Division filed a verified complaint to terminate defendants' parental rights and award the Division guardianship of all four children. We will not recite in detail the circumstances that led to the filing of the guardianship complaint, which began with the emergency removal of the children following the October 2, 2016 death of the mother's fifth child, M.M., an eight-year-old boy.[3] The death was ruled a homicide for which both defendants were charged and incarcerated, awaiting trial, and remained incarcerated throughout the guardianship litigation.

Prior to her son's death, the mother had a long history with the Division dating back to 2012, involving investigations for referrals alleging substance abuse, inadequate supervision, neglect, excessive absenteeism from school, and

---

[3] The child's biological father was not a party to the litigation.

physical abuse. With one exception, the prior referrals were ruled "unfounded" or "not established." See N.J.A.C. 3A:10-7.3. However, in 2015, when K.M.R.-S.'s diagnosis for "failure to thrive" due to improper feeding was substantiated, K.M.R.-S. was removed but subsequently reunified with the mother after she completed services, which included undergoing individual psychotherapy,[4] anger management counseling,[5] and substance abuse services, as well as attending parenting classes.[6] Following the October 2, 2016 removal of all four children, the Division was granted care, custody, and supervision pursuant to

---

[4] The psychotherapeutic treatment was recommended after the mother underwent a psychiatric evaluation, which disclosed that she suffered from "mood d[y]sregulation disorder, unspecified bipolar disorder, unspecified personality disorder, or another psychotic dimension." The diagnosis was based on the mother's "problems with anger, impulse control, maladaptive personality traits, and fixed delusions." After the FN litigation was terminated in August 2016, the mother's therapist indicated in a termination summary that the mother terminated treatment "prematurely" before "address[ing] the parenting concerns at the root of the referral."

[5] Although the mother denied any anger management problems, she admitted using physical discipline on the children in the past.

[6] The father did not appear in the 2015 FN litigation involving his daughter's failure to thrive, or make himself available for services. In fact, at the time, the mother denied being in a relationship with him. However, during the Division's investigation of a July 2016 allegation of physical abuse of M.M. by the mother, which was subsequently ruled "not established," the father indicated during the investigation that while he did not reside in the home, he assisted the mother in caring for all the children.

A-4651-17T2

N.J.S.A. 9:6-8.21 and 30:4C-12, and the children were placed in resource homes.

Judge David B. Katz conducted the three-day guardianship trial on non-consecutive days from April 16 to May 4, 2018. At the trial, in addition to the admission into evidence of numerous documentary exhibits, Division caseworker Mikael[7] Williams testified about the Division's extensive history and involvement with the family. She recounted the Division's efforts to provide services to defendants, including visitation. She explained that the mother was not afforded visitation with her sons by court order based on a November 18, 2016 Regional Diagnostic and Treatment Center (RDTC) evaluation recommending "substantial caution" in facilitating visitation "due to the trauma that [the boys had] experienced" from "witness[ing] certain events that led to the death of their brother." The mother was, however, afforded monthly supervised visits with her daughters at the Essex County Jail. On the other hand, although the father had requested visitation with his daughter, visitation was suspended based on a March 24, 2017 bonding evaluation, recommending against visitation.

---

[7] The witness' name appears alternately as Micole in the record.

A-4651-17T2

Other than visitation, Williams further testified that defendants "request[ed] no services or contact by the Division," and refused to undergo the psychological evaluations offered by the Division in order to determine appropriate "services to try to better improve [their] case outcomes." However, while the mother "completed a parenting class and a women empowerment program" provided by the Essex County Jail, Williams testified that the father "received [no] services" and spent time in protective custody at the jail.

Williams also detailed the Division's assessment of placement options for the children. She testified that the mother's refusal to disclose the identity of K.J.R.'s and K.K.R.-S.'s biological fathers prevented the Division from "assess[ing] possible relatives" to "care for the children." However, at the mother's request, the Division assessed four individuals, S.J., S.C., L.H., and L.M. S.J., K.F.'s girlfriend, was ruled out because she "resided with [K.B.R.'s father]," S.C., a maternal cousin, and L.M., a relative of K.F., were ruled out because there was "insufficient . . . space in [their respective] home[s]," and L.H., a family friend, was "ruled . . . out on best interests" grounds because she was friendly with and resided "in the same building as [the mother's mother,]" who had "prior substantiations" with the Division as well as "a criminal history."

8

In addition, Williams testified that the father identified his three sisters for placement of his daughter: D.U., Gl.U., and Ga.U. However, Gl.U. was ruled out because "she had two . . . active cases" with the Division, D.U. was ruled out because she failed to attend "a drug treatment program" recommended by the Division, and Ga.U. "moved to Pennsylvania" and failed to contact Williams as requested in order for the Division to conduct an assessment. According to Williams, none of the rule-out determinations were appealed and none of the individuals requested reconsideration.

Williams also testified about the children's special needs and the mother's "resistan[ce]" to the children receiving the medical care needed. Williams explained that the boys "have an umbilical hernia," vision problems, and were both "diagnosed with ADHD." K.M.R.-S. had "a speech delay" and an overgrowth of her left eye. K.K.R.-S. "was diagnosed with cerebral palsy" and ischemia, "a rare birth defect[,]" and had a variety of developmental delays. According to Williams, all the children received individualized therapy, and K.M.R.-S. underwent eye surgery. K.K.R.-S. also underwent eye surgery as well as several MRIs because of her extensive medical issues.

Williams further testified that the children's current caretakers were providing the children with "good care" and were meeting all their needs,

including facilitating regular sibling visits. Williams confirmed that the Division's plan for the children was adoption. She explained that while K.M.R.-S.'s resource parent was committed to adoption, the resource parents of the other children had not yet made a commitment.[8] In the event the resource parents decided against adoption, then the Division's plan would be "select home adoption"[9] for the three remaining children. After explaining the process for "select home adoption," Williams indicated she had no concerns about the Division's ability to find an adoptive home for the children because "they [were] still young[,]" had not "had a lot of placements[,]" and were "great kids."

Division expert Elizabeth Groisser, Ph.D., a psychologist, testified about the March 24, 2017 bonding evaluation she conducted at the Essex County Jail between the mother and her two daughters, and between the father and K.M.R.-S. As a result of those evaluations, Groisser opined there was "no bond" between K.M.R.-S. and her father, and, based on K.M.R.-S.'s "intense anxiety"

---

[8] Williams explained that the boys were placed together and have been in the same resource home since their removal in October 2016. While the girls were initially placed together, they were separated in October 2017 when they were removed from the resource home after K.K.R.-S. sustained a fractured tibia. Thereafter, K.M.R.-S. and K.K.R.-S. were placed in different resource homes.

[9] Select home adoption refers to "a process that includes looking for an adoptive home in New Jersey and registering the child[ren] on the national adoption exchange." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 98 (2008).

during the visit, recommended that visitation be discontinued, whether therapeutic or not, because of the "psychological harm in terms of the distress and anxiety" suffered by K.M.R.-S. Regarding the mother, because Groisser found that the bond between K.M.R.-S. and her mother was "ambivalent," and that "there was no real bond on the part of [K.K.R.-S.] to her mother[,]" Groisser recommended that continued visitation should be monitored for signs of psychological distress. Groisser also opined, however, that discontinuing visitation with the mother would not harm the girls.

We incorporate by reference the extensive factual findings and sound legal conclusions in Judge Katz' May 29, 2018 oral opinion, rendered following the guardianship trial, and only recite Judge Katz' key findings supporting his decision. Preliminarily, "[b]ased on her overall demeanor and the substance of her testimony," the judge found Williams "credible" and "trustworthy[,]" explaining that "[s]he testified in a straightforward, direct manner[,]" and "was not impeached." Likewise, the judge "credit[ed] Dr. Groisser's testimony[,]" explaining that "[s]he testified in a professional manner," and that her testimony was "complete, thorough, . . . comprehensive[,]" and unrebutted.

Next, the judge recounted the mother's extensive history with the Division, and detailed the children's previously "unaddressed medical

conditions" and "special needs" that were only detected, diagnosed, and treated through the Division's efforts. The judge expounded on the October 2, 2016 referral that led to the removal and guardianship litigation. The judge explained that "[t]he referral was from University Hospital paramedics, who had been dispatched to [the] family home at 9:30 a.m.," following the mother's report that her eight-year-old son had a "seizure in the bathtub." "However, when the paramedics arrived, [the child] was fully clothed and dry[,]" and "in cardiac arrest." In addition, "[h]e was not breathing, and . . . had no pulse." He "was pronounced dead at University Hospital" later that morning.

The judge stated that the "death was reported as suspicious[,]" and Division "workers were informed that [the child] arrived at the hospital with several injuries that appeared to be very recent." "The hospital also noted that [the child] did not have any history of seizures or heart conditions." The judge noted that the autopsy report revealed

> blunt impact injuries. Contusions of the heart, lung[s], and thymus. Contusions of the [mediastinal] soft tissue[s and] aorta. Aspirated blood in both lungs. Blood[y] effusion in both pleura[l] . . . cavities. Contusions of the scalp. Contusions and abrasions of the lips. Contusions and abrasion[s] of extremities and the buttock. Contusions of the . . . abdominal wall. As well as scalding of [the] lower extremities.

According to the judge, the Division investigator reported that upon being informed of her son's demise, the mother's "demeanor" was "distasteful and unremorseful." She "was more concerned" about being "misinformed" about the length of time she would be "detained" at the Prosecutor's Office than "the loss of her son." Although she denied the father was living in her home at the time, she acknowledged he assisted her in removing her son from "the tub and dress[ing] him before [the paramedics] arrived, because she was, '[c]oncerned about him being naked.'" She also "denied knowing anything about most of [the] bruises and marks, but . . . did acknowledge the bruise on the stomach [from] earlier that day." Additionally, she "denied ever hitting [her son] with an object," but acknowledged being "home all morning with her children."

The judge continued that both K.J.R. and K.B.R. made statements to investigators and to the RDTC evaluator, implicating defendants in their brother's death. On October 2, 2016, K.J.R., who was then "a few weeks short of his seventh birthday," told investigators that the father "punched [his brother] twice in the stomach," and made his brother "put his head in the water[,]" as a result of which his brother "pee[d] in the bathtub[,]" "[h]is [brother's] heart was [not] beating anymore[,]" and his brother "was at his grave." K.B.R., "who was

ten days shy of his fifth birthday," told investigators on October 2, 2016, that the father "put [his brother] in the tub and burned his leg."

"A little over three weeks later," on October 27, 2016, when the boys underwent psychosocial evaluations at the RDTC, K.J.R. reiterated that the father "punched [his brother] in the chest," that "[h]is brother . . . was punished bad[,]" and that the father "was lying." K.J.R. also stated that the mother "told [him there was] a ghost . . . in the room with [his brother,]" in an apparent attempt to explain the screams K.J.R. heard coming from his brother. Similarly, K.B.R. told the RDTC evaluator that his brother was dead because the father "punched [his brother] in the chest," and "put [him] in the tub." According to K.B.R., "'[t]he water was hot and [his brother] was crying.'" K.B.R. also stated that after his brother was placed in the tub, the mother "put [his brother's] head in the water." K.B.R. said his "[brother's] nose was bleeding" and that his brother "[d]ied out." K.B.R. "stated that he, too, was scared of ghosts."

Judge Katz stated that the RDTC evaluator determined that both boys "displayed signs of trauma and post[-]traumatic stress disorder." As a result, the evaluator recommended no "contact between [the boys and the father] and that there be significant caution regarding any contact between [the boys and the

14

mother.]" In addition, "[b]oth boys were referred for trauma focused therapy services," which began in March 2017 and has continued since.

In discussing the services provided to defendants by the Division, the judge pointed out that defendants "have both remained incarcerated throughout this litigation[,]" and initially "requested the Division not contact them, until further [c]ourt order." Defendants also "declined to participate in any psychological evaluation[s]." A December 8, 2016 order "allow[ed] the Division to send . . . periodic photos of the children to their respective parents[,]" and that practice "has continued throughout the litigation." According to the judge, although defendants were ordered to keep the Division apprised of any services received at the jail, there was no record or indication that the father "has participated in any services while being incarcerated." On the other hand, the mother completed a parenting class.

Judge Katz explained that defendants' requests for visitation were initially denied pending receipt of the children's evaluations. Upon receipt of the RDTC evaluation, on December 8, 2016, the court suspended visitation between the mother and the boys. However, the court "granted [the mother] monthly visitation with [the girls], supervised by both the Division caseworker and a jail social worker[,]" based on Dr. Groisser's recommendation that any visits "should

be monthly, and with the Division monitoring for any psychological regression or distress."  Regarding the father, on May 11, 2017, the court suspended visitation with K.M.R.-S. based on Dr. Groisser's recommendation that ongoing visits "only provided [the father] with the opportunity to see his daughter, and would be detrimental to the child psychologically."

Crediting Dr. Groisser's unrebutted opinions based on the March 24, 2017 bonding evaluations, the judge determined that there was no bond between the father and K.M.R.-S. and "continued visits with [the father] could actually cause the child harm."  As to the mother, the judge accepted Dr. Groisser's opinion that while K.K.R.-S. did not "appear to be in distress, there was no evidence of an attachment between her and [the mother,]" and the bond between K.M.R.-S. and the mother was "ambivalent."  Thus, relying on Dr. Groisser's opinion, the judge acknowledged that the girls would not be harmed "if [they] did not see [the mother]."

The judge also discussed the Division's efforts to find permanent homes for the children.  He explained that the Division had assessed for placement several individuals identified by defendants, "all of whom have been ruled out." The judge further indicated that the children's special needs were currently being met by the resource parents, with the Division's support.  The judge

16

acknowledged that with the exception of K.M.R.-S.'s resource parent, none of the other resource parents had made commitments to adopt the children. However, the judge credited Williams' testimony that once the children were freed for adoption, there were "no concerns about the children being adopted" through "the process [of] select home adoption," given the children's age, placement history, and the fact that they were "'great kids.'"

After reciting his factual findings, the judge applied the appropriate legal principles and concluded that the Division "satisfied each prong of the best interest[s] standard by clear and convincing evidence." First, the judge determined that the father's actions, which led to the brother's death while the other children were in the home, and the mother's failure to protect the children from the father, who, by his own admission, "assisted with the care of the children," satisfied the first prong. See In re Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992) ("[I]njury to children need not be physical to give rise to State termination of biological parent-child relationships. Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights.").

The judge elaborated:

[The father's] abuse of [the brother] occurred in the home while all four children were present. The boys . . . call him daddy, even though he[] [is] not the biological father of them. His actions, in their presence, the screaming, the crying, the resulting trauma to the children, demonstrate that [the father] has endanger[ed] the safety, health, and development of all the children, including [K.M.R.-S.], by his actions, on October 2, 2016.

Similarly, [the mother] . . . has participated, both directly and indirectly, in causing the child[ren's] safety, health, and development to be endangered.

First, she was in the home and failed, at a minimum, to intervene to protect the children. Second, [K.B.R.] stated that [the mother] put [his brother's] head in the water. Third, while the abuse was . . . occurring, and [the brother] was screaming in his room, [the mother] attempted to justify or explain it by telling [K.J.R.] that there was a ghost in [their brother's] room, as if the ghost was causing injury to [their brother].

See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 289 (2007) ("A parent is unfit if he or she is unable or unwilling to prevent harm to the child irrespective of the source of the harm[,]" and "[c]onsequently, a parent's association with third-parties may be an appropriate consideration if those associations harm the child.").

The judge referred to the autopsy report, admitted into evidence without objection, detailing the brother's extensive injuries, and indicated that the boys' statements implicating defendants in the death of their brother provided

18

compelling proof to satisfy prong one. Although the children's statements were admitted without objection, the judge acknowledged that the statements were hearsay that were not admissible in a guardianship trial under N.J.S.A. 9:6-8.46(a)(4) pursuant to New Jersey Division of Child Protection and Permanency v. T.U.B., 450 N.J. Super. 210, 214 (App. Div. 2017). However, according to the judge, the statements qualified under the excited utterance exception to the hearsay rule, Rule 803(c)(2), notwithstanding the fact that the statements were not all contemporaneous with the startling event. N.J.R.E. 803 (c)(2); see State v. Long, 173 N.J. 138, 159-60 (2002) (holding that "even a somewhat lengthy delay will not always prevent a statement from being admissible under Rule 803(c)(2)" because the Rule focuses instead "on whether nervous excitement was generated, whether there was a reasonable proximity in time between the event and the declarant's subsequent description of it, and whether there was a lack of opportunity to deliberate or fabricate the circumstances").

The judge determined "[i]t [was] clear from the surrounding circumstances" that the boys were "under the stress of their brother's death" and "[t]here certainly was no opportunity . . . to fabricate or deliberate" when they made the "statements on the same day as the tragic death of [their brother]" as well as "three weeks later to the [RDTC] evaluator[.]" The judge noted that

19

during the RDTC evaluation, "[K.J.R.] became withdrawn when speaking about his brother[,]" "[p]ut his head down on the [evaluator's] desk, . . . had a significant depressed mood, and avoided questions about [his brother]." K.B.R. also "became withdrawn" when discussing his brother and "spontaneously replied, '[his brother] dead'" when "asked who he lived with[.]" Thus, the judge found that the statements were sufficiently trustworthy to be admitted under Rule 803(c)(2).

Turning to prong two, the judge found that "[t]he Division ha[d] shown clearly and convincingly" that defendants were "unwilling or unable to limit the harm facing [the children]." According to the judge, defendants "have been incarcerated throughout the litigation," "have refused to comply with Division services since the beginning of th[e] litigation[,]" specifically "declining to . . . participate in psychological evaluations," which as Williams testified, "were for the purpose[] of determining recommended services."[10] Further, while the

---

[10] We do not deem the judge's reliance on defendants' refusal to undergo psychological evaluations to determine appropriate services as violating defendants' Fifth Amendment rights against self-incrimination. In that regard, we distinguish these circumstances from those in New Jersey Division of Child Protection and Permanency v. S.K., 456 N.J. Super. 245, 251 (App. Div. 2018), where we held that a judge "may not draw an adverse inference of culpability against a defendant who invokes his right against self-incrimination to refuse to testify at a Title 9 fact-finding hearing." We determined that under those

mother "participated in parenting classes[,]" the father had not provided any evidence of his "participation [in] services in the jail, despite [being] encourage[d to] . . . do so[,]" and despite being "released from protective custody" "since about August 2017[.]"

Additionally, neither defendant had "provided any indication that they[] [were] going to be released from incarceration in the foreseeable future[,]" "[n]or ha[d] they indicated they would be in any position to parent their children upon their release." According to the judge, this was of particular concern because all four children have special needs, leading the judge to conclude "that delaying permanency conditionally upon [defendants'] . . . unspecified release, at some point in the future, would only exasperate the significant emotional trauma they have suffered." See N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483-84 (App. Div. 2012) ("[C]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement[,]" and "[a]ccordingly, 'expeditious, permanent placement' is favored over 'protracted efforts for reunification'" (third alteration in original) (first quoting N.J. Div. of Youth & Family Servs. v. S.F.,

_____

circumstances, a "defendant's decision to refuse to testify was constitutionally protected under the Fifth Amendment . . . and [Rule] 503." Id. at 274.

A-4651-17T2

392 N.J. Super. 201, 210 (App. Div. 2007); and then quoting N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004))).

Turning to prong three, the judge determined that the Division's efforts to provide services to the family dated back to the 2015 substantiated failure to thrive allegation, and the Division "continued to exert reasonable efforts [to] provide services to [defendants] while they remain[ed] incarcerated." See N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 579, 621 (App. Div. 2007) ("We have recognized 'the difficulty and likely futility of providing services to a person in custody'" (quoting N.J. Div. of Youth & Family Servs. v. S.A., 382 N.J. Super. 525, 535-36 (App. Div. 2006))). However, defendants declined the "psychological evaluations to determine the need for additional services on May 11, 2017[,]" and, "[a]t the time of the initial filing on October [4], 2016," requested "that the Division not contact them[,]" other than providing "periodic photos of the children, and keep[ing] them updated as to events[,]" a practice the Division "continued throughout the litigation." See In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999) ("The diligence of [the Division's] efforts on behalf of a parent is not measured by their success" but "must be assessed against the standard of adequacy in light of all the circumstances of a given case.").

Specifically addressing visitation, the judge noted that "the Division ha[d] expended considerable efforts to provide visitation for [defendants,]" including arranging the RDTC evaluations for the boys and the bonding evaluations for the girls. As a result of these evaluations, "the [c]ourt determined that visitation was no[t] appropriate for either of the boys." Further, "while [the father's] visitation with [K.M.R.-S.] was suspended" based on Dr. Groisser's opinion "that the visits were harmful to the child[,]" the mother was, in fact, afforded "monthly supervised visitation." Continuing his analysis of prong three, the judge discussed the Division's efforts in assessing "resources for the placement of the children[,]" all of whom were appropriately "ruled out as viable caregivers." See F.H., 389 N.J. Super. at 621 ("Even if the Division had been deficient in the services offered . . . , reversal would still not be warranted, because the best interests of the child controls.").

Turning to prong four, the judge acknowledged that because this was predominantly "a select home adoption case[,]" "the question before the [c]ourt . . . [was] whether the harm suffered by the child[ren] outweigh[ed] the benefit of . . . having the child[ren] free for . . . adoption." The judge concluded that "the harm [did] not outweigh the [benefit] of freeing the child[ren]" for adoption because the Division demonstrated by clear and convincing evidence "that all

23

four children would greatly benefit from the termination of . . . the biological parent[s'] rights and the pursuit of permanency through adoption."

In making this determination, the judge pointed to the "significant special needs" of the children, all of which were now "being met with the support of the Division and their respective resource families[,]" as well as the fact that "there[] [was] no realistic likelihood defendants would be able to safe[l]y and appropriately care for the children in the foreseeable future" given their "incarcerat[ion] with no anticipated release dates" and their rejection of "Division-offered services." Relying on New Jersey Division of Youth and Family Services v. R.G., 217 N.J. 527, 555 (2014), the judge acknowledged that "incarceration alone, without particularized evidence [of] how a parent's incarceration affects each prong, [was] an insufficient basis for terminating parental rights." Instead, "[t]he [c]ourt ha[d] to look at the nature of the underlying crime[] giving rise to the incarceration" insomuch as it was "relevant" to parental unfitness. According to the judge, "here, the underlying crimes [were] aggravated manslaughter, and endangering the welfare of a child[,]" both crimes which "directly bear on parental unfitness."

The judge noted further that "the relationship" between "the parents and the child[ren] before they were incarcerated" was another factor "to be

considered[.]" In that regard, based on "Dr. Groisser's unrebutted testimony," the judge found that the girls had "very little, if any, relationship with the parents." In fact, K.M.R.-S. would be harmed by contact with the father and had an "ambivalent" relationship with the mother. As to K.K.R.-S., the judge stressed "there was no attachment between her and [the mother]." Likewise, based on the RDTC evaluations, the judge reiterated that contact with defendants was not in the boys' best interests and would jeopardize their "well-being." The judge was "also satisfied that the children [would] be adopted" based on Williams' confidence that the Division would be able to "find forever homes for the[] children" through select home adoption. See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996) (explaining that some termination actions are not predicated upon a comparative bonding analysis, but rather reflect the child's "need for permanency" and the parent's "inability to care for [the child] in the foreseeable future").

Thus, according to the judge, there was "extensive evidence that terminating defendant[s'] parental rights will not do more harm than good." "Rather, the good in permanency far outweigh[ed] the harm." See In re Guardianship of K.H.O., 161 N.J. 337, 357 (1999) ("In all our guardianship and adoption cases, the child's need for permanency and stability emerges as a

25                                                                    A-4651-17T2

central factor."). The judge entered a memorializing order terminating defendants' parental rights and these appeals followed.

Our scope of review on appeals from orders terminating parental rights is limited. In such cases, we will generally uphold the trial court's findings, so long as they are supported by "adequate, substantial, and credible evidence." R.G., 217 N.J. at 552. Indeed, we must give substantial deference to the family court judge's special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. Id. at 552-53. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings are "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Even where the parents allege "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be afforded unless the judge "went so wide of the mark that a mistake must have been made." M.M., 189 N.J. at 279 (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

Guided by these standards, we conclude that Judge Katz' factual findings are amply supported by the credible evidence in the record, and his legal conclusions are unassailable. "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012). Here, the judge carefully reviewed the evidence presented at trial, made copious findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law. See, e.g., F.M., 211 N.J. at 447-54; E.P., 196 N.J. at 103-07; K.H.O., 161 N.J. at 347-63; D.M.H., 161 N.J. at 375-93; N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986). We thus affirm substantially for the reasons Judge Katz expressed in his comprehensive and well-reasoned oral opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4651-17T2